Gregory Schell of the Migrant Farmworker Justice Project, appearing on behalf of the 143 U.S. farmworker appellants, two of whom are with us here today, Mr. Martín Santos and Humberto Hernández. In its decision 30 years ago, in the case of Alfred L. Snapp and Sons v. Puerto Rico, the United States Supreme Court emphasized that the temporary foreign labor provisions, the obvious point of the temporary foreign labor provisions of our immigration act, immigration laws, is to provide two assurances to United States workers. First, that these workers will have a preference in hiring over foreign workers as jobs become available in this country. And second, to the extent that foreign workers are admitted, that their admission will not adversely affect the wages and working conditions of domestic workers. The question before the Court today is whether Mr. Santos, Mr. Hernández, and the other U.S. farmworker appellants, like their farmworker counterparts in the Fourth and Fifth Circuits, may rely on the working arrangement provisions of the Migrant and Seasonal Agricultural Worker Protection Act to do so. Yes. Ginsburg. Can I ask a supervening question? I am very confused about whether there are two causes of action here or one. The complaint seems to depend on the working arrangement issue. But the statute, as I understand it, has a private cause of action for any violation of the assurances, so of the regulations or the statute. So do we have one? Do we have to find that there was a working arrangement for you to prevail or not? Your Honor. Certainly, you pled it that way. You pled as if you do. The working arrangement is the claim here. There is not a blanket claim for violation of any statute. That's incorporated into the clearance order, job order, that is attached as part of the temporary labor certification application. Okay. And there is a promise in that by the employer, I will comply with all laws. The enforcement mechanism of that is the opposed working arrangement provision. You promise to do this, you promise to comply with all laws. Failure to do so violates the working arrangement. So the working arrangement is the hinge here. And tell me why isn't there a separate provision that says that anybody can bring a cause of action, let's see if I can find it now, relatively recently enacted, not that recently, but fairly recently. That's where I became kind of mystified. I'm sorry? All right. Go ahead. And when I find it, I will ask you. Go ahead. All right. Absent the right to seek relief under the APA, these plaintiffs are left with no meaningful remedy, because the administrative remedy suggested and to which they were relegated by the district court does not have any provision for payment of damages to these plaintiffs for their lost employment opportunities. It is, as the district court in Vega v. Norse Farms said, no remedy at all for workers who have been denied jobs. The working arrangement provision has been used a number of times for U.S. workers trying to vindicate their rights under the H.W.A. Let me go back to where I was. The statute that I had in mind, and maybe I know the answer to this, is 299 U.S.C. Section 184a, maintenance of a civil action in district court by a grieved person. Any person aggrieved by a violation of this chapter or any regulation under this chapter by a farm labor contractor, et cetera, may file suit in any district court, et cetera. Is the problem that this doesn't apply for damages? Is that your problem? No. The district court said that they the plaintiffs could not bring action under APA, because in order to invoke 299 U.S.C. 1854, there must be a violation of the APA or one of its regulations. The APA provision that was violated here was the working arrangement. With no working arrangement, which is what the district court found, there's no APA claim. What the district court said, you could go to the plaintiffs, go file a complaint  to the Department of Labor. The Department of Labor, the problem with that is it's twofold. First of all, the agent, the division of the Department of Labor with which a complaint could be filed is the Employment and Training Administration. It's the wing that grants the certification. But let's go to what is the working arrangement. The working arrangement here was, the working arrangement was part, as part of its temporary labor certification application. In the actual job order, the employer here signed a promise that he would follow all recruiting requirements imposed by the government. Specifically, in the June 27th letter, one of those requirements was to meet the working arrangement. Kagan. And you don't think the working arrangement at least goes to – I understand that it's broad with regard to the regulations and statutes, but doesn't it at least go to the fact that it has to be an employee that you're having an arrangement with? No. And the best proof of that is what the Fifth Circuit did in a case that's – a pair of cases, two sides of the same coin. In 1977, employers, growers on the – in West Texas who had been relying on undocumented labor learned that Border Patrol was going to be active. And the employer said, well, we better apply for H-2A workers or H-2 workers at that time. And two cases came out of that, both of which are cited by us. Salazar Calderon was brought by the H-2 workers, the guest workers. But there was another case brought, Montelongo v. Meese, which is cited in our reply brief. Montelongo v. Meese were the group of domestic workers in the Rio Grande Valley. Not knowing that the foreign workers were going to be approved, the employer rounded up some people in the Rio Grande Valley, said, okay, we haven't been certified yet, but we've got a place for you. When the certification is issued, the employer says, never mind. Those workers, never employed, were allowed to recover, and the Fifth Circuit But they were employed. I mean, that's the theory. The theory is that they were promised employment. The workers themselves – this is important as well. The workers themselves never saw anyone from the company. Their crew leaders were talked to by the recruiter. That was the limit of their connection. That's similar to actually what happened in this case. And as to that group of people, they did get relief. They did. And it's considered – it's comparable to the Castaño crew here, where Mr. DeLeon ran into Mr. Castaño at the gas station, said, get your crew ready. Is that on appeal? No, I don't understand. That is not. Okay. But I'm saying – but to say that there was an employment relationship, the other case would be Burnett v. Hepburn Orchards, which is a district court case from Maryland, which is cited in our brief. In that case, the workers went up to apply for a job, and they found they were subjected to a pre-hiring test that had not been disclosed, never were hired, and sued. And they were successful in suing under the working arrangement provisions. And under both – all those cases, there was never an employment relationship, yet they were able to recover under the working arrangement. The working arrangement, as the district court said, it – the district court had the right formulation. They applied it incorrectly. Is there an affirmative and specific duty imposed on an employer with respect to his U.S. employees or prospective U.S. employees? That's the proper formulation. Even though the district court at some point says, well, we're going to require what the Eastern District of California did, that this promise be communicated to the workers, it backed off that. And actually, its formulation on page 28 of the district court opinion is the correct formulation. The problem was they drew an artificial line that is not supported by the case law or the – or the purpose of the statute between those workers who had actually – who were entitled to notice and never got it, and those workers who, by happenstance, their crew leader was talked to at the gas station. The working arrangement – the reason there's such a broad working arrangement in this case, under the OPA, is because of Congress's recognition of the situation farmworkers found themselves in. The Eleventh Circuit – So let's get more specific. What is the working arrangement here? It's – as far as I can tell, the strongest part of your case is that they were told – the employer was told they had to actually communicate with former employees and didn't do it. Correct. Is that where we're focusing? That is the working reason. They had to notify and solicit their return. That was the requirement. They didn't do it. And to which their defense is it's not the same job. Their defense is it's not the same job and that the Department of Labor went ahead and certified, despite the fact we didn't mention to them, we didn't fall through. Now, the not – the certification is something of – is not very helpful because the certification on page 91 of the record excerpts, we have the certification letter. And what the certification letter says is this certification is granted subject to the conditions and assurances made during the application process. In other words, you followed through on what you promised to do. So – Did they have the letter in which – did they have to make some representations to get that certification? They had to report the results of their – All right. Did they? That doesn't seem to be in the record. They – there – there is no written document other than submissions of their – we paid for these radio ads and this newspaper ad. That's it. There's no narrative with it. And based on that, because of the short time frames, remember the time frames here, June 27th, we say go get work or start recruiting. By July 13th, two and a half weeks later, tell us what you found. Not a lot of time. And that's why the reliance of the Department of Labor on the employer's accurate and complete report is substantial here. The – the recruit – and the effort of the employer to say, well, all right, we tried to do it as we've always done it through these crew leaders, these – these foremen that would go out, that's unavailing as well. Because remember, the meeting with the foreman occurred weeks after the certification had been approved. The period of time when domestic labor should have been recruited was during this window between June 27th and July 13th. There was no attempt made to contact the foreman during that time period. The reason it was so early was because work was going to start on August 15th. And because of the deadline set forth in the statute, the Department of Labor had to make a ruling on July 14th. They didn't have the wiggle room to say, well, maybe you should go back and do this. What do we make of the district court's factual conclusion that none of the plaintiffs would have been willing to take the job? That isn't – the court didn't conclude that. If you look at page 17 of the court's opinion, even though it's in the conclusions of law, what the court – the court does say there was credible evidence that workers from San Luis wouldn't work. But they stopped short – the district court stopped short of doing that in its actual – in its actual opinion. What it said was, in that section, it says, well, the reason these folks didn't get hired was because they didn't apply. And there could have been two possible explanations for that, and the court did not decide which one was right. One of those was that the workers were not aware of the existence of the jobs. The other one being maybe they didn't want to go out and work as far away from home. But the court did not resolve that dispute. It's also worth noting that the – Well, it's – I'm looking at finding of fact 69. Although there was testimony at trial that the plaintiffs would have been willing to take a harvesting job at White Wing and either reside in the barracks or pay for their own daily commute, the court does not find such testimony credible. The testimony was that it takes two to three hours one way to commute, et cetera, et cetera. There was credible testimony that the San Luis workers would not go to White Wing for jobs and then went on from there. So I'm asking, what do you make of that? There's a credible testimony. Again, the court on page 17 says otherwise of its opinion. It's worth noting that there's opinion in the record excerpts at page 68. Mr. Castagna, the crew foreman that was offered a job, he testified, well, where does your crew work? Your San Luis crew, where do you go to work? I take my crew out to White Wing. He had done that, in fact. And in fact, so there – it was a mixed bag. The court never resolved that issue. There is no factual finding. The court only notes there was credible evidence. And one of the things that hasn't been answered, of course, is it's hard to gauge this, because this was – because this was a job through the H-2A program, certain benefits had to be extended to the workers that did not normally get offered to workers in that area. The wage would be $8 an hour rather than $5.15. Would workers travel farther, ride the bus for an extra 50 percent in wages? Quite possibly. They would have an amount of work guaranteed. If they chose to live at White Wing, they would get free housing. That was the labor market test that was supposed to be done between June 27th and July 13th, and it was not, because the workers were never presented with that job opportunity. That's what this case is about. They should have been able to decide whether that was a job they were interested in. That's what the – that was the working arrangement that was violated. And is it – in terms of this, however one reads paragraph 69, the evidence was that some of the work from White Wing was going to be in the Yuma Valley. Correct. And in fact – And if it took two or three hours, they were going to do it. That's right. And that's what happened with the White Wing crew. They actually came from White Wing and drove back and forth each day. But the early work, the work – if you look at the job order itself, the first three months of the job was limited to two locations, not the four. One was Yuma Valley. One was White Wing. The Maricopa and Illinois work wasn't even going to start until November. This was a time when there wasn't as much work. If you look at the testimony of the workers who appeared at trial, most of them said, well, I couldn't get a job until October, because the early part of the harvest, which was only lemons, there aren't as many jobs. When the oranges became ripe in November, the work increased and there were more options for folks. But so in terms of the work, that's absolutely right. There was commuting between the two locations. That was done. And ultimately, SAMI in the subsequent season made a decision that it made more sense logistically to run two bases. There was enough work in the Yuma Valley to have a crew base out of San Luis, which it did the following year, as well as the crew in White Wing to do the work out there. I'd like to reserve the rest of my time for rebuttal. Very good. We'll hear from SAMI. Good morning. May it please the Court, Tom Crowe, on behalf of the defendant, Appleby's. While this case is replete with a variety of complex facts, the issue presented is a relatively narrow one involving Title 29, United States Code, Section 1832C,  Could you begin, though, with my question about why this wouldn't be covered by 1854? Why are we getting into the working arrangement part? I don't understand it. I'm sorry? Why are we getting to the working arrangement issue? Good question. The working arrangement issue does not apply here. So why — but why wouldn't we just reach the same questions under 1854? Well, the action was not brought — the issue presented by the plaintiffs of the contention at trial was that the alleged failure of the employer to abide by the assurances given to the Department of Labor comprised part and parcel of the working arrangement. So they just — so we could decide that, but we could say, but that isn't to say they couldn't have brought the same thing under 1854. They just didn't. I'm sorry? They couldn't have brought just the same thing directly under 1854. They just didn't. I don't know where we're going. I'm kind of — but the case law seems to assume it, too, and I think that's partly because 1854 wasn't — there was a question of as to whether there was a private act right of action for a long time, and then this was passed. Do you know when 1854 was passed? When was it passed? Yeah. It was followed the enactment of the Farm Labor Contract Registration Act. I'm not sure the exact year. But 1854 is later. Yeah. Is that right? Am I right about that? I don't know when that was passed. Okay. So the answer is you don't know. That's right. All right. But since there were earlier cases saying that there is no private right of action directly in the statute, it must have been later than those cases. That's correct. All right. Go ahead. So I'm not up to speed on 1854 because that's not the plaintiff's contention here. I mean, their contention is solely confined to 1832c, the working arrangement provision. And the district court found that the recruitment assurances provided by the employer to the Department of Labor are not job-related working conditions. And let me phrase it more specifically here in terms of what this Court must decide. It has to decide that was the district court wrong and did it err when it found that the specific recruitment directives of Department of Labor to the employer in this June 2006 letter were not job-related working arrangements that had been reached between the employer and its former employees from the 2004-2005 and 2005-2006 seasons. So that's what they say. Well, they also say, and there is some testimony, and I don't remember what the findings were, that they said we'll see you next year essentially, i.e., that there was some agreement to rehire them. There's some sense of that. Well, there's no evidence in the record that there was any agreement, that the workers from the 2004-2005 and 2005-2006 seasons would be promised employment. Well, they say it. I mean, there is some evidence. I don't remember whether there was a finding. I'm not aware of any such evidence in the record. And the district court found specifically here that these plaintiffs, they might well have expected to be employed in the Yuma Valley area, and that is, as you know, the area where the employees, prospective employees would cross the border and gather at the area that they've called the core loan harvest in the Yuma Valley fields. But with respect to the separate area that's here in issue, namely the White Wing area, that the district court found is one-way commute between two and three hours. But in fact, they're doing that. This is the part I don't understand. They are working – they were working in the Yuma Valley, and they were running those buses from White Wing. But the – your client was. I'm having difficulty understanding you. Well, I'm sorry if you're having difficulty. Why don't you try, okay? I think it's my hearing. I mean, perhaps it is. But the issue is this. The – the – Sammy was working in the Yuma Valley that year. Right? Which year? The year that we're talking about here. Very little. In the 2000s? No. There were 300 acres out of about, I mean, I don't know, 1,000 or – it was a substantial portion of the work. I respectfully beg to differ. The record shows that while Sammy did some operations in the Yuma Valley, the vast majority of the 300 acres was – I don't know if it was a vast majority, but there were 300 acres, which doesn't sound like peanuts. All right? And they were running buses, I gather, from White Wing to do that work. That did happen on a very limited basis. The majority of the harvesting in the Yuma Valley was conducted by Dominguez and Galindo and Glendo, according to the record. But they applied for H-2A employees for the Yuma Valley to work out of White Wing, right? That's correct. That's correct. And either Sammy or its predecessor, SAMCO, had done that every year from 2002 through 2011. Okay. Which suggests that this commute was not ridiculous. Well, the assumption you're making is that there was any significant operations in Yuma Valley that were conducted out of White Wing. And my suggestion to you is those were limited, although I will agree with you that the 300 acres in Yuma Valley were included in the job clearance order with respect to the area of employment. But the real divide here, Your Honor, is whether, with respect to these prior employees who harvested in the Yuma Valley in the 2004, 2005, and 2005-2006 seasons, was the recruitment assurance that was provided by Sammy to the Department of Labor, part of that working arrangement. And as the district court noted, there is no case, there's not one case that's ever so held. There's a separation between the relationship with Sammy and the Department of Labor with respect to recruitment and those job-related matters that pertain to the working arrangement itself. That's readily apparent. Now, the district court, though, did find the 50 percent enforceable. Why was that? Yes. Okay. How is it different? Well, the 50 percent rule is different in several respects. The – it is not a recruitment assurance. It does not require interpretation by the DOL, unlike the recruitment assurances. It's included in the job order, unlike the recruitment assurances. But it's not in agreement with any particular employee. It's not. An agreement with any particular employee. That's correct. It's not. But it is what's the – So what's the line that you would draw? How do you define what's a working arrangement and what isn't? The definition springs in part from what the matter is. But what is it? I don't know what it springs from. What's the definition? The working arrangement is what is included in the job order, as well as what was communicated between the employer and the employee. So whether – So it doesn't have to run to particular employees. It's – whatever is a contractual term in the job order is part of the working arrangement. In addition to those contractual terms, if the employer, as some of the cases cited by plaintiff, has promised to provide some other working benefit, whether it's extra equipment or extra wages, then that also – So now I am having a difficulty between we will hire people who apply before we've done 50 percent of the work, although there aren't any such people now, and we will offer jobs to our former employees. What's the difference? Well, I mean – They're both in the assurances, right? The difference is what is and isn't included in the job order, because the job order is the contract of employment. And if I may say, with respect to the 50 percent rule, Your Honor, the plaintiffs here – So the difference is that in the document that they submitted, they said the 50 percent thing. They didn't say the recruitment. And the DOL said to them, but you have to do the recruitment. That's true. I think there's three differences there. In answer to your question, number one, that the 50 percent rule is included in the job order is a contractual term for that reason, as all the cases have so held. Number two, the 50 percent rule, unlike the recruitment assurances, does not require any interpretation by the Department of Labor. It has nothing to do with the recruitment process. The 50 percent rule is post-recruitment, after the employees have showed up at the job site. And number three, it does not relate – well, that's redundant to the certification process. But finally, it undermines the fundamental claim of the plaintiffs here, because they say that they were denied employment at White Wing, whereas under the 50 percent rule, they could have gone out there at any time, through the first half of the season, if they had chosen, and the employer would have been compelled, under the terms of the job order and the 50 percent rule, to hire them. I mean, that's what really undercuts their claims here. They claim that they were not offered employment, but as a matter of law, through 50 percent of that contract period, the employer was obligated to hire all of them, and they never sought employment. And the district court found, as a matter of fact, that they had never sought, any of them, employment at White Wing. I think it goes back to the history of the H-2A. The subsection, as Your Honor knows, is from the Immigration and Nationality Act. The APA is not a regulatory provision that is addressed to the H-2A program. APA is addressed to securing and protecting the rights of migrant and seasonal farm workers. Where is the 50 percent assurance in the application? Where is that set for? The 50 percent rule is Title 20. I know that. I want to know where it is in the application. That seems to be your position. It was in the application. I don't have the application in front of me. It is included in the application as a matter of law. And whether that in this – whether the particular temporary labor certification at the – at what part of the temporary labor certification is that 50 percent rule referenced, I can't tell you, without spending some time going through it. Well, I don't think it is. I mean, at least I can't find it. Well, it's included as a matter of law under 20C. So why isn't it also – this is where I'm having a problem. So why is it also included as a matter of law that if the DOL tells you to make certain recruitment steps, you have to do them? Because there is no statute. I thought there's a regulation that says that if the DOL tells you to do something, you have to do it. There's no statute. There's no regulation. There's no case that says the recruitment assurances are part of the working arrangement. And if you're asking me why is that, it's because it is a separate and distinct process, because APA is designed to protect the working conditions of those employees that are going to work there. These are prior employees. These are prior employees who say that it was part of their working relationship in 2004, 2005, and 2005, 2006, those employees being ones who have never sought employment at Whiteling according to the undisputed record. So we agree that the 50 percent rule is applicable. I can't tell you right now at what point in the job order it is set forth. But we agree it's there, and we agree it's a requirement of law, and we agree that the employer is required to abide by that. So in summary, what the plaintiffs contend is that this Court should embark on a novel voyage and hold that this recruitment process, by which they did have an administrative remedy. Granted, they could have not they could not have recovered damages, but they could have secured injunctive relief. They could have otherwise barred the employer from bringing in these workers. Indeed, they did file for administrative relief and were pursuing that and withdrew their application for reasons unknown. And the district court commented that they had that option. They chose not to pursue it. It's not a matter of exhaustion of administrative remedies, but it's a matter of apples and oranges, because this whole recruitment body of law is distinct from APA. And the 50 percent rule is not a recruitment procedure. It's not. It's an added guarantee to ensure that the employer, even what the employer may have done, no matter how complete it may have been, that nevertheless, similarly qualified, situated U.S. workers are not going to be displaced, and they will be offered employment by the employer. I'm trying to figure out where my time is. Am I over? No. You've got five minutes. You don't have to use it. It's not that hard. Have I answered your questions? Well, I would like to take one more stab at what is the definition of a working arrangement that leads to recruitment act. Okay? Is it because the rule is not in AWPA? Is that why? Because it isn't in the rules and it isn't in the right place? Is it because it's not with current employees but past employees? Is it because – I mean, what is the line that you're arguing for? You're not arguing that you are recognizing that some set of statutes and regulations are incorporated. That's true. Okay. So then what? What's next? Well, I think that's answered – it may sound simplistic in response to your question, Judge Perzan, but the statute says no employer shall, without justification, violate the terms of any working arrangement made by that employer with any seasonal agriculture worker. So the employer did not make any working arrangement with these folks from 2004, 2005, and 2005, 2006 with respect to their recruitment. The – it is – it's simply not part of the recruitment process. But it did make an arrangement with anybody who showed up before 50 percent of the work was done to hire them. As a matter of fact, that's true, because it's post-recruitment, and it doesn't require any processing by DOI. But there's no actual person to whom that runs. It's just anybody. That's true. Any qualified – any similarly qualified U.S. worker that wants a job where you have temporary H-2A workers is entitled to a job. And if that – the employer has committed to do that as an additional assurance that the importation of foreign workers will not displace similarly situated and qualified U.S. workers. Have I satisfied you? I don't know if you've satisfied me, but you answered the question. So thank you. I'm sorry. I'm apparently losing my hearing. I'd like to address some of the questions that were raised to opposing counsel. First of all, where does this promise come from? If we look at the clearance order, the relevant page is actually page 112 of the appellee's record excerpts. As part of the clearance order, Sammy agreed that it would be performing the other specific recruitment activities specified in the notice from the regional administrator of the Employment Training Administration as required by paragraph 655.105A of the regulations. And Your Honor is correct. The 50 percent rule is not in there. It's referenced – it's mentioned – it's incorporated by reference. But here is a specific provision in the clearance order on that. With respect to the 1854 question, I'd like to give another attempt to explain what happened. The Farm Labor Contractor Registration Act was enacted in 1963 without a private right of action. In 1974, it was amended to add a private right of action which would, for the first time, allow migrant workers to enforce the protections. The counterpart of that is 29 U.S.C. 1854 C.1. What that does, it allows you – 1854 allows a Federal court right of action for workers to enforce any of the protections provided elsewhere in the Act. It is not a protection in and of itself. So – and that's the origin of that. With respect to the 50 percent rule, there's an important difference here. Essentially, the suggestion was given that there was no harm to the workers here because they could have gone up and applied for the job. But the 50 percent rule is very different than recruitment in an important way. It is positive recruitment. And here, Mr. De Leon and his company were required to go out and not only notify, but solicit the workers to return. The 50 percent rule places no affirmative obligations on the employer as far as searching for workers. If somebody shows up and hears about it, yep, got to hire them. But it does not require them to go search those people out. That's the problem with the definition of working arrangement. And all the other cases you've cited have to do with terms and conditions of employment once employed. Well, there goes – What case is like this in terms of pure recruitment? There was – there's been no case in where it was sued where there was a specific obligation to contact specific workers on the employer's part, the counterpart here. The employer failed to do so. There are those cases, though, again, where there was recruitment undertaken pre-certification. And that's where Montelongo v. Meese is helpful. Pre-certification, before the foreign workers were ever approved, they went out and talked to the crews in the Rio Grande Valley and said, y'all come. And then the deal fell through because they got the foreign workers. And that's what happened here. The affirmative recruitment here – we need to look at the picture here as well and why this was so important. This job order requested workers – required workers to have experience. That was going to eliminate a lot of potential workers that had to have experience in citrus picking. Who was most likely to have that experience? The former crew members, of course. What was the affirmative recruitment done here? Well, we talked about the fact that the crew foremen weren't talked to until after the – after the certification had been granted and the full contingent of foreign workers was approved. Prior to July 13th, the date that the report had to go to the government, who'd you find? The employer had done exactly two things. They'd placed one print ad and they'd – they'd placed two 15-second radio spots. That was it. And now they did, on the day that they reported, place a second ad in the newspaper and ran two more 15-second spots. Not surprisingly, those didn't produce – the day of – the day they ran them, they didn't produce immediate response. Do we know whether those ads – what the location was? I couldn't quite tell what their obligation was with regard to geography. They were placed in the San Luis area. They were in that area. That's right. But the reason – ultimate reason why we need – why this working arrangement is such a broad test is what the Eleventh Circuit observed in its Carl Galvan versus Curtis Richardson case. The reason we have this law is because farm laborers are poor, politically weak, and excluded from overtime and collective bargaining rights afforded to other types of workers. They are always vulnerable to exploitation. For that reason, they need a broad protection. And for that reason, Congress deliberately selected the very broad term working arrangement rather than some other formulation. And for that same reason, this Court and others have applied it broadly. Thank you for your time. Thank you both for your arguments. The case will just be – the case just heard will be submitted for decision. Appreciate your briefing and arguments in this case. It's very interesting. And we'll be in recess now for the morning.
judges: Noonan, Thomas, Berzon